Filed 6/29/23  P. v. Sierra CA6

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PASIANO RAMIREZ SIERRA,<br><br>    Defendant and Appellant. | H047833<br>(Santa Clara County<br>Super. Ct. No. C1888352) |

Defendant Pasiano Ramirez Sierra was convicted by jury of four counts of rape under Penal Code section 261, subdivision (a)(2).[1]  Defendant challenges these convictions based on an instructional error.  To prove rape under subdivision (a)(2) of section 261, the prosecutor was required to show that the defendant committed the offense by means of "force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another."  (§ 261, subd. (a)(2).)  Defendant argues that the jury was erroneously instructed that this "means" element may be satisfied by "fear of immediate *or future* unlawful bodily injury."  (Italics added.)  The People concede that the instruction on future injury was erroneous, and we agree.  However, in light of the findings that the jury necessarily made in rendering its verdicts, we conclude that the error was harmless beyond a reasonable doubt.  We therefore affirm the judgment.

---

[1]  Subsequent statutory references are to the Penal Code.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. *The Charges*

In April 2018, defendant was charged with four counts of raping K.D.[2] by force, violence, duress, menace, or fear under section 261, subdivision (a)(2).  Defendant also was charged with one count of assault with intent to commit a felony (rape) against E.D., a friend of K.D., which was later dismissed based on the statute of limitations.  A subsequent information added enhancement allegations for burglary on the first rape count and kidnapping on the remaining rape counts.

### B. *The Trial*

At trial, the prosecutor presented testimony from K.D. and six other witnesses, including E.D.  Defendant presented testimony from a cousin and took the stand himself.  After deliberating for less than five hours, the jury found defendant guilty of all four counts of rape and that he committed burglary and kidnapping in connection with the rapes.

#### 1. K.D.'s Testimony

Through an interpreter, K.D. testified that in 2004 and 2005, when she was 17 years old, defendant raped her four times.  K.D. had moved from Mexico the year before and spoke little English.  Though defendant was older, K.D. knew him because he was one of the nephews of the man her mother M.D. was dating.  Defendant also was the cousin of A.R., a boy K.D.'s age whom she had dated the year before.  K.D. knew defendant well enough to greet him when they met, but they were not friends, and she had no romantic relationship with him.  Indeed, K.D. testified that, before the rapes, she had never spent time alone with defendant.

---

[2] To protect the privacy of the victims in this case, we refer to them and to other witnesses by their initials.  Because the two victims used the surname Doe at trial, we refer to them as "K.D." and "E.D." and to K.D.'s mother as "M.D."

K.D. testified that the first rape occurred in November 2004. On that day, she was sick and stayed home from school. After her mother and defendant's uncle left to visit someone in jail, K.D. took some medicine and went to sleep. K.D.'s mother, however, kept a window unlocked so that the front door could be opened without a key, and when K.D. woke up, defendant was standing next to her bed. K.D. tried to leave, moving quickly towards the exit. But defendant shoved her face down onto a bed in the living room, flipped her over, removed her clothing, and had sexual intercourse with her while she cried. K.D. tried to fight defendant off, but she is small, only five feet tall, and was unable to do so.

Initially, defendant was silent, but as he flipped K.D. over, he told her not to yell out and threatened to tell a social worker that her mother sold tamales (presumably without a license) and have them separated. Defendant also told K.D. that no one would believe that he raped her because she had not scratched him. Believing defendant and fearing that no one would believe her, K.D. did not tell her mother or anyone else that she had been raped.

K.D. also testified that a month or two later defendant raped her again. This time defendant approached K.D. as she walked home from school. Defendant pulled up his car, told K.D. he wanted to see her later in the afternoon at the church, and threatened to rape K.D.'s younger sister if K.D. did not show up. Believing defendant, K.D. later went to the church, got in defendant's car, and rode with him to a duplex. Inside, defendant tossed K.D. onto the floor, removed her pants, and had sexual intercourse with her. K.D. once again cried, but she did not fight back this time out of concern that, if defendant did not rape her, he would rape her younger sister. Before they left the duplex, defendant once again told K.D. that no one would believe her.

According to K.D., the third rape occurred another month or two later. While K.D. was walking to the store, defendant pulled up in his car and told her to get in. Still fearful for her younger sister, K.D. did so and rode with defendant to a motel. Defendant

3

pulled K.D. by her hair into a room and, once inside, shoved a pillow in her face and struck her twice. He then removed K.D.'s pants and had sexual intercourse with her while she again cried. Afterwards defendant struck K.D. with his belt and told K.D., who was wearing makeup that time, that she was dressed like a whore. When he dropped her off, defendant once again told K.D. not to say anything.

K.D. testified that still another month or two later defendant raped her a fourth time. K.D. was sitting alone in a pizza shop waiting for her younger sister, when defendant arrived and told K.D. to get into his car, which she did out of fear for her sister. Defendant took K.D. back to the same motel as before, shoved her onto the bed, and had sexual intercourse with her while she cried, though this time he used a condom that he had obtained on the way. Defendant once again told K.D. that no one would believe her, this time adding that several of his cousins had committed crimes without the police doing anything.

Defendant approached K.D. one other time. This time, however, he said that he would leave her alone because she had gotten fat, which K.D. was happy to hear.

K.D. did not tell anyone that defendant had raped her, even her friend E.D whom K.D. believed defendant had tried to rape in 2007, about two years later, at a Christmas party. Indeed, that incident confirmed to K.D. the danger that defendant posed to her younger sister.

In 2012, however, K.D. and her family moved to another state, and she became involved with a man, H.C., with whom she thought she had a future. Because she was having difficult being physically intimate with H.C., K.D. told him that she had been raped when she was a teenager. Later, K.D. also told L.R., a pastor where she was now living, that she had been raped. Around the same time, K.D. had a child with H.C. and decided to contact the police to make sure that defendant did not harm anyone else. After contacting the police, K.D. finally told her friend E.D. that defendant had raped her.

4

### 2. The Corroborating Witnesses

The prosecutor presented several witnesses that corroborated K.D.'s testimony. H.C. testified that in 2014 K.D. confided to him that she had been raped by the nephew of her mother's boyfriend. L.R., the pastor, testified that in 2017 K.D. confided that, when she was 17 years old, she had been raped several times by the nephew of her mother's boyfriend. In doing so, L.R. added, K.D. cried and looked ashamed.

Though K.D. never told her mother M.D. about the rapes, the prosecutor called M.D. to the stand. M.D. testified that she never saw K.D. alone with defendant and that defendant never asked for permission to date K.D., as the mother required when K.D. was in high school. M.D. also testified that she never invited defendant into her home without his uncle and confirmed that in 2004 she often left the window to her home unlocked.

Finally, the prosecutor presented testimony from an expert in forensic psychology who testified "blind"—without any knowledge of the parties or the case—concerning the impact of trauma on victims of sexual assault. The expert explained that rape victims often engage in "counterintuitive victim behavior," in which they freeze in response to rape, especially when the offender is known to them and uses limited physical force. The expert also testified that rape victims often do not disclose rapes, even to close friends and family members, for many years.

### 3. E.D.'s Testimony on the Uncharged Offense

To show that defendant was disposed to commit sexual offenses, the prosecutor also presented testimony that defendant attempted to rape K.D.'s friend E.D.

E.D. testified that in December 2007 she attended a Christmas party at K.D.'s home. According to E.D., there were a dozen or so people at the party eating, drinking and listening to music in the backyard, including defendant, his uncle, and some cousins. Although E.D. had met defendant, they were not friends, and she had no romantic interest in him.

5

At some point, E.D. went into K.D.'s room to use the bathroom connected to it. When she finished, defendant was in K.D.'s room, with the door to the backyard closed. E.D. tried to leave, but defendant grabbed her, pushed her onto the bed, and started kissing her. E.D. screamed for him to stop, but defendant held her down and began to pull down her pants.

At that point, E.D.'s phone rang. E.D. was able to answer the call, which was from K.D., and to tell her to come to the room. Hearing this, defendant stopped and told E.D. that, if she said anything, no one would believe her. When K.D. arrived, E.D. pulled up her pants and went outside. She screamed "violad[or]," or rapist, and later, as defendant was leaving, slapped him. Defendant's friends laughed.

E.D. testified that she immediately told K.D. and her mother what happened, but was too embarrassed to tell anyone else and did not go to the police because she was afraid of defendant and his cousins. In 2018, however, defendant's picture popped up on E.D.'s Facebook account, and she decided to contact the police. Around the same time, K.D. called E.D. and revealed that defendant had raped her and she was reporting the rapes to the police. E.D. was upset that K.D. had not disclosed the rapes earlier—and, indeed, received medical treatment for anxiety—but she went through with her decision and filed a report with the police.

### 4. The Defense's Evidence

After the prosecutor rested, defendant called his cousin A.R. to the stand. In addition to confirming that he dated K.D. for about a year, A.R. testified that he was at the Christmas party in 2007, but denied that E.D. seemed upset, accused defendant of rape, or slapped him. A.R. also testified that he had never seen defendant be violent with women and offered his opinion that defendant was not violent towards women. A.R. admitted, however, that he did not know whether his cousin had dated K.D. and had never seen the two alone.

6

Defendant then took the stand. He denied that he raped K.D. or attempted to rape E.D., that he ever entered K.D.'s home without permission, that he threatened to rape K.D.'s younger sister, or that he was ever violent with K.D.

Defendant, who had been interviewed by the police twice prior to being charged, admitted to having sexual relations with K.D. Defendant testified that in 2004 and early 2005, when he was 24 years old, he had an innocent, romantic relationship with the then 17-year-old K.D, in which they would hold hands, kiss, and go to the park. Defendant said that he did not become intimate with K.D. until one day in February 2005 when he came by after work, she let him into the house, and they had consensual sexual relations. Once, according to defendant, they went to a park and decided to go to a motel. Other times they had sexual relations in K.D.'s house or his apartment. This relationship lasted about three months until it ended because defendant started taking English classes after work.

Defendant also admitted that during a Christmas party sometime later he went into K.D.'s room with E.D. but described it as a romantic encounter. According to defendant, both had decided to go to the restroom, and after chatting a bit, they began kissing. Defendant testified that E.D. eventually pushed him away, saying that they could not kiss because he had dated her friend K.D. Defendant also admitted that E.D. slapped him, but said that it happened while they were playing a game similar to spin the bottle and E.D. did so because he had kissed her despite having been K.D.'s boyfriend.

5.  The Jury Instructions

Before trial, defendant requested the standard Judicial Council instruction on rape by force, fear, or threats, which identifies three elements: (1) sexual intercourse, (2) without consent (3) by means of "force, violence, duress, menace or fear of immediate and unlawful bodily injury to the woman or to someone else." (CALJIC No. 1000 (2022 ed.).) For reasons not specified in the record, the trial court modified the instruction. First, it added an element: the defendant was not married to the woman with whom he

7

had sexual intercourse. Second, it added two words, "or future," to the means element, so that the jury was instructed that the means element may be satisfied by showing non-consensual intercourse "by force, violence, duress, menace, or fear of immediate *or future* unlawful bodily injury to the woman or to someone else." (Italics added.)

### 6. Closing Arguments

In closing argument, the prosecutor contended that the jury was faced with "two completely different versions of the events." K.D. testified that she and defendant " 'had no relationship and he raped me, and I never consented,' " while defendant testified that the two " 'were in a relationship' " and " 'dated almost three or four months.' " As a consequence, the prosecutor observed, there was "no middle ground," and there was "only one issue in this case, and it's consent." In other words, did the intercourse "happen with force[,] the way K[.D.] said that it happened," or was "the sex . . . consensual," as defendant contended? The prosecutor then argued that the testimony of K.D. and the witnesses corroborating her testimony was more credible, defending the credibility of both K.D. and E.D. and noting the obvious bias of defendant's cousin as well as the implausibility of, and inconsistencies and contradictions in, defendant's testimony.

The prosecutor did not ask the jury to find defendant guilty based on the trial court's instruction about future injury. To the contrary, the prosecutor's primary argument on the means element was that defendant raped K.D. by force, and the prosecutor pointed to defendant's assault on E.D. as "evidence that he was likely to commit rape by using force" on K.D. Indeed, in summarizing the means element, the prosecutor made no mention of fear of future injury and instead quoted the relevant statutory language: "force, violence, duress, menace, or fear of immediate and unlawful bodily injury." (§ 261, subd. (a)(2).) In discussing the means element, the prosecutor briefly mentioned "the threats defendant made" to K.D., but did so in discussing duress, not fear of future bodily injury.

8

In closing argument, defense counsel did not discuss fear of future bodily injury or, indeed, mention the means element at all. Instead, implicitly acknowledging that the primary issue before the jury was consent and credibility, defense counsel focused on the credibility of K.D. and, even more so, E.D. She argued that E.D.'s description of defendant's assault at the Christmas party was implausible, and pointed out inconsistencies between the testimony of E.D. and K.D. about the assault. Defense counsel also questioned why K.D. remained silent about the rapes for so long, especially to her friend E.D., and suggested that K.D. and E.D. may have fabricated their testimony.

### 7. The Jury's Verdict

After a short deliberation, the jury convicted defendant on all four counts of rape and found true the sentencing enhancement allegations that he committed burglary in connection with the first count and kidnapping in connection with the remaining three counts.

### C. *Sentencing and Notice of Appeal*

On January 17, 2020, the trial court sentenced defendant to four consecutive terms of 25 years to life for a total sentence of 100 years to life. Four days later, defendant filed a timely notice of appeal.

## II. DISCUSSION

Defendant argues that the trial court erred in instructing the jury that fear of future bodily injury may satisfy the means element of rape under section 261, subdivision (a)(2).[3] Reviewing this claim of instructional error de novo (see *People v. Thomas* (2023) 14 Cal.5th 327, 361), we agree that the instruction on future injury, which the People do not defend, was erroneous, but we nonetheless affirm because this error was harmless beyond a reasonable doubt.

---

[3] Defendant also initially argued that there was an error in the abstract of the judgment, but later withdrew this argument.

## A. *The Error in the Jury Instruction*

Although defendant requested the Judicial Council's model instruction on rape under section 261, subdivision (a)(2), the trial court added a reference to future injury to the instruction. As the People concede (RB 19-21), this addition was error.

Defendant was charged with rape by force, violence, duress, menace, or fear in violation of section 261, subdivision (a)(2). As the Judicial Council's model instruction recognizes (CALJIC No. 1000 (2022 ed.)), this offense has three elements: (1) sexual intercourse (2) without consent (3) by means of "force, violence, duress, menace or fear of immediate and unlawful bodily injury" to the victim or someone else. (§ 261, subd. (a)(2).) The trial court substituted two words into the fear component of the offense's means element. Rather than instructing the jury that "fear of immediate and unlawful bodily injury" satisfies the means element, the trial court instructed the jury that the element is satisfied by "fear of immediate *or future* unlawful bodily injury." (Italics added.) Thus, the trial court expanded the means element to include fear of future unlawful bodily injury.

The trial court erred in expanding the fear component of the means element. Section 261 makes it a criminal offense to engage in non-consensual sexual intercourse by any "force, violence, duress, [or] menace." (§ 261, subd. (a)(2); see also *id.*, § 667.61, subd. (b) & (c) [setting punishment].) However, the statute does not make it a crime to engage in non-consensual intercourse due to any fear. Instead, section 261 requires fear of "immediate and unlawful bodily injury on the person or another." (§ 261, subd. (a)(2).) By adding future injury, the trial court's instruction substantially expanded the fear component, permitting conviction for non-consensual intercourse by means of fear of either "immediate or future"—that is, essentially any—unlawful bodily injury.

This expansion of the fear component undermined the restrictions that section 261 places on rape by threats. Subsection (a)(6) makes it a crime to engage in non-consensual sexual intercourse "by threatening to retaliate in the future against the victim or any other

10

person." (§ 261, subd. (a)(6).)  However, subsection (a)(6) requires "a reasonable possibility that the perpetrator will execute the threat."  (*Ibid*.)  It also limits "threatening to retaliate" to threats to kidnap, falsely imprison, or inflict "extreme pain, serious bodily injury, or death."  (*Ibid*.)  Thus, section 261 punishes non-consensual intercourse by threat of bodily injury only if (1) the threat is reasonably likely to be executed, and (2) it involves death, serious injury, or extreme pain.  The trial court's modified instruction allowed the jury to convict defendant of rape based on a threat of future bodily injury without these restrictions.

It makes no difference that defendant failed to object to the trial court's expansion of the rape instruction.  Generally, defendants may not appeal a trial court's actions unless they have objected to those actions in the trial court and given the court a chance to correct any mistakes.  Jury instructions, however, are treated differently if they have "affected the substantial rights of the defendant" (§ 1259), which erroneous instructions concerning the elements of an offense do.  (See, e.g., *People v. Smithy* (1999) 20 Cal.4th 936, 976, fn. 7.)  Accordingly, as the People recognize, where "the trial court gives an instruction that is an incorrect statement of the law," a criminal defendant may appeal the instruction whether or not he or she objected to the instruction at trial.  (*People v. Hudson* (2006) 38 Cal.4th 1002, 1011-1012; see also *People v. Ngo* (2014) 225 Cal.App.4th 126, 149.)  Thus, defendant may object to the trial court's erroneous expansion of section 261, subdivision (a)(2)'s means element.

### B.  Harmless Error Analysis

Because the right to a jury trial under the Sixth Amendment includes the "right to a jury properly instructed in the relevant law" (*In re Martinez* (2017) 3 Cal.5th 1216, 1224), erroneous jury instructions violate the United States Constitution and constitute reversible error unless the federal harmless error standard in *Chapman v. California* (1967) 386 U.S. 18 is satisfied.  (See, e.g., *In re Lopez* (2023) 14 Cal.5th 562, 580 (*Lopez*); *People v. Merritt* (2017) 2 Cal.5th 819, 824, 831 (*Merritt*).)

11

Under the federal harmless error standard, "[t]he reviewing court must reverse the conviction unless after, after examining the entire cause, including the evidence, and considering all relevant circumstances, it determines the error was harmless beyond a reasonable doubt." (*People v. Aledamat* (2019) 8 Cal.5th 1, 3 (*Aledamat*); see also *Neder v. United States* (1999) 527 U.S. 1, 18 [asking "[i]s it clear beyond a reasonable doubt that a rational jury would have found the defendant guilty absent the error?"].) Where, as here, a jury has been instructed on both correct and incorrect theories—so-called "alternative-theory error"—the erroneous instruction is harmless if " 'the reviewing court concludes beyond a reasonable doubt that the error did not contribute to the verdict.' " (*Aledamat, supra*, at 10, quoting *People v. Chun* (2009) 45 Cal.4th 1172, 1201.)

Although harmless error is an "exacting" test, (*Lopez, supra*, 14 Cal.5th at p. 581), it is not an impossible one. For example, harmless error may be demonstrated by showing that, in rendering a verdict, the jury "necessarily found the defendant guilty on a proper theory." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1131 (*Guiton*); see also *People v. Flood* (1998) 18 Cal.4th 470, 506 [noting that instructional error is harmless where "the jury necessarily found the omitted element in connection with other findings required by the instructions"].) However, a reviewing court need not determine with " 'absolute certainty' " what a jury found in rendering a verdict (*Hedgpeth v. Pulido* (2008) 555 U.S. 57, 62) or, indeed, that the jury's verdict actually rested on a proper ground. (*People v. Gonzales* (2012) 54 Cal.4th 643, 666.) Instead, the relevant inquiry is "whether any rational jury would surely have rendered the same verdict had it been properly instructed." (*Lopez, supra*, 14 Cal.5th at p. 584.) Consequently, a reviewing court may find harmless error by determining that the jury necessarily made certain findings and that" '[n]o reasonable jury that made all of these findings could have failed' " to convict the defendant on proper grounds. (*Aledamat, supra*, 8 Cal.5th at p. 15, quoting *Merritt, supra*, at p. 832; see also *In re Ferrell* (2023) 14 Cal.5th 593, 603 [Error is harmless if "no reasonable jury would have found in favor of the defendant on

the valid theory, given the jury's actual verdict and the state of the evidence," quotations omitted].)

The harmless error standard is satisfied here. In light of the findings that the jury necessarily made in reaching its verdict and the evidence in the record, we conclude beyond a reasonable doubt that the error in the trial court's instruction did not contribute to the jury's verdicts and that, if properly instructed, the jury would have found defendant guilty.

### 1. The First Rape Count

The erroneous inclusion of future injury in the trial court's instruction on the means element did not contribute to defendant's conviction on the first count of rape because at the time of that rape there was no threat of future injury implicating the instruction.

K.D. testified that defendant first raped her in November 2004. According to K.D., this rape was by means of force. She awoke to find defendant in her room, and when she tried to leave the apartment, he shoved her face down onto a bed in the living room, flipped her over, removed her clothing, and, despite her attempts to fight him off, had sexual intercourse with her.

There was no evidence that defendant threatened any future injury or otherwise created a fear of such injury at this point. Indeed, K.D. testified that defendant was silent during most of the incident, and the only threat that he made was to tell a social worker that her mother was selling tamales (presumably without a license). It was not until a month or two later, when defendant pulled his car up to K.D. as she was walking home from school, that he told K.D. he could do to her younger sister what he had done to her. Moreover, far from suggesting that the threat against K.D.'s sister had been made earlier, defendant denied ever making such a threat.

Defendant concedes that there was no evidence of any threat or fear of future injury in connection with the first rape and that the jury had no factual basis for

convicting him of the first rape based on fear of future injury. He nonetheless asserts that the jury may have been led to convict him of all four counts based on a theory of future injury because prosecutor did not differentiate between the different counts. But the prosecutor did not ask the jury to convict defendant based on fear of future injury. To the contrary, the prosecutor asked the jury to convict defendant of "rape by force."

It is true that the prosecutor told the jury that it could convict defendant of rape based on "force, violence, duress, menace or fear" without agreeing on one particular means. However, the prosecutor also told the jury it could find "fear of immediate *and unlawful* bodily injury" (Italics added), not fear of future injury. In addition, while the prosecutor mentioned defendant's threats against K.D.'s sister, the prosecutor did so in asking the jury to find duress, explaining K.D.'s silence, and urging the jury to find the kidnapping enhancements. Thus, nothing in the prosecutor's closing argument encouraged the jury to find rape by means of fear of future injury.

In short, no rational jury could have found defendant guilty of the first count of rape by means of fear of future bodily injury, and there is no reason to believe that the jury even considered fear of future injury in connection with that count. Thus, it is clear beyond a reasonable doubt that the erroneous reference to future injury in the instruction on the means element did not contribute to the jury's verdict on the first rape count and that defendant was convicted of this count on a valid theory.

### 2. The Remaining Rape Counts

K.D. testified that defendant threatened her younger sister before the second rape and that she (K.D.) did not fight back during that rape out of fear for what defendant would do to her sister. As a consequence, under the error in the trial court's instruction a rational jury might have found that defendant raped K.D. on this occasion, and subsequent ones as well, by means of fear of future bodily injury to her sister. Nonetheless, the error was harmless because the jury's verdicts show beyond a

14

reasonable doubt that, even absent the error, it would have convicted defendant of rape by means of force.

In convicting defendant on the remaining three rape counts, the jury necessarily rejected defendant's testimony concerning his relations with K.D. and credited K.D.'s. Although defendant acknowledged having sexual intercourse with K.D., he denied raping her and testified instead that they had an innocent, romantic relationship in which they would hold hands, kiss, and go to the park, which eventually led to consensual sexual relations. K.D. provided a sharply different account. According to K.D., while she knew defendant, they were not friends and did not date; she did not consent to have sexual intercourse with him; and defendant imposed himself on her by force each time that they had sexual intercourse. As the prosecutor recognized in her closing argument, because these accounts are diametrically opposed, the primary issue at trial was credibility, and in convicting defendant of rape the jury necessarily found K.D. more credible that defendant and credited her testimony that defendant raped her.

In light of the jury's necessary rejection of defendant's testimony, its finding that defendant raped K.D. four times, and its finding that the first rape was by force, no rational jury would have failed to find that the subsequent rapes were also by force. A jury has "wide latitude to believe or disbelieve witnesses, or even specific portions of their testimony" (*Lopez*, *supra*, 14 Cal.5th at p. 591), and "may accept as true a portion of the testimony of a witness and disbelieve the remainder." (*People v. Crooker* (1956) 47 Cal.2d 348, 355.) There is, however, no basis in the record here for a rational jury to credit K.D.'s testimony that she was raped and that the first rape was by force yet reject her testimony that the remaining rapes were by force.

K.D.'s testimony concerning each of the rapes was similar. She testified that each time defendant shoved her onto a bed and removed her clothing before having sexual intercourse with her while she cried. There were some differences: K.D. testified that she tried to fight defendant off the first time that they had sexual intercourse and that he

15

struck her the third time. But there is nothing in K.D.'s testimony, in the other testimony presented at trial, or in defendant's closing arguments that made K.D.'s testimony about the use of force in the final three rapes less credible than her testimony about the use of force in the first rape, and therefore nothing that would lead a rational jury to find that defendant used force in the first rape, but not in the other three.

Nor has defendant offered any reason why a rational jury would have credited K.D.'s testimony concerning use of force in the first rape but rejected it in connection with the subsequent ones. Defendant argues that the jury might have questioned whether he used force in light of evidence that he is not physically imposing and the testimony of his cousin that he has no reputation for violence towards woman. That is unlikely. While defendant testified that that he is at most five feet seven inches tall, even at this height he towered over K., who is only five feet tall  In addition, the opinion of defendant's cousin concerning his propensity toward violence against woman was conclusory and could be perceived as biased because of his familial relationship with Defendant. Even more important, the jury necessarily rejected these arguments in convicting defendant on the first count of rape by force. Thus, defendant has failed to explain how a rational jury that found he used force in the first rape could have failed to find that he used force in the other three.

We therefore conclude that, in light of the evidence in the record and the findings actually made, any rational jury would have found that defendant raped K.D. by force had it been properly instructed, and therefore the error in the instruction about fear of future injury was harmless beyond a reasonable doubt. (*See Aledamat, supra*, 8 Cal.5th at p. 15; *Merritt*, *supra*, 2 Cal.5th at p. 832.)

### 3. The Closing Argument

Defendant argues that the erroneous instruction on future injury must have been important because in closing argument the prosecutor chose to rely "on the theory of threats, rather than focus on rape by force, duress, or menace." As the Supreme Court

16

recently recognized, however, there is nothing unusual or inherently significant about the prosecution invoking erroneous instruction, and "mere reliance on an invalid theory will not overcome a showing of harmlessness." (*Lopez*, *supra*, 14 Cal.5th at p. 590.) Even more important, in this case, the prosecutor did not rely on the erroneous instruction concerning future injury. During closing argument the prosecutor correctly described the means element using the statutory language and did not mention the future injury language added by the trial court. Indeed, in arguing that the means element was satisfied, the prosecutor focused primarily on a theory of rape by force, and she mentioned the threats made by the defendant in discussing duress, not future injury. Moreover, to the extent that the jury relied on the threats against K.D.'s sister, it necessarily found duress, which, like force, is a proper means under section 261, subdivision (a)(2).

In arguing that the means element of section 261, subdivision (a)(2) was satisfied, the prosecutor's primary theory was that defendant raped K.D. by means of force. The prosecutor pointed to K.D.'s testimony that defendant "pushed her down and took off her pants" before having sexual intercourse with her, and argued that defendant "*forced* [K.D.] on that very first day, held her down, [and] took down her pants." (Italics added.) Indeed, according to the prosecutor, the primary question before the jury was did the sexual relations between defendant and K.D. "happen *with force* the way [K.D.] said that it happened," or was it consensual, as defendant claimed. (Italics added.)

As defendant points out, in closing argument, the prosecutor referred several times to defendant's threats against K.D.'s younger sister. But, as shown above, in most of these instances, the prosecutor was not discussing the means element of rape. At one point, the prosecutor pointed to the threats to defend K.D.'s credibility, explaining that K.D. remained silent about the rapes because she believed that defendant would rape her younger sister if she did not. At other points, the prosecutor argued that the threats helped to prove kidnapping, the enhancement allegation for the final three counts of rape.

An element of kidnapping is taking a person by, among other things, "instilling reasonable fear." (*People v. Burney* (2009) 47 Cal.4th 203, 232 (*Burney*).) Accordingly, the prosecutor argued that K.D. went into defendant's car and rode with him because she feared that, if she did not, defendant would harm her younger sister.

In discussing the means element, the prosecutor made one passing reference to "the threats the defendant made." However, contrary to defendant's assertions, the prosecutor did not urge the jury to find rape by means of fear of future bodily harm. Instead, the prosecutor mentioned the threats against K.D.'s sister in discussing duress— which, unlike fear of future bodily injury, is a proper way to satisfy the means element. (§ 261, subd. (a)(2) [prohibiting sexual intercourse "accomplished against a person's will by means of force, violence, *duress*, menace, or fear of immediate and unlawful bodily injury," italics added].) After mentioning "duress," the prosecutor urged the jury to consider "the circumstances," including that K.D. was only 17 years old in 2004, did not speak English, and was new to the country, as well as the "threats the defendant made to her, an older man . . . she knew through her mom's boyfriend." These are all factors used to determine the existence of duress: under section 261, "[t]he total circumstances, including the age of the victim and the victim's relationship to defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b)(1).) Thus, in including the threats made to K.D. in the "circumstances," the prosecutor plainly was discussing duress, not fear of future bodily injury.

Finally, even if the jury had decided on its own to find defendant's threats against K.D.'s sister satisfied the means element, it necessarily would have found duress, a proper means. Defendant asserts that the jury "could reasonably question" whether there was duress because duress requires a threat "sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed." (§ 261, subd. (b)(1).) But the jury found that defendant kidnapped K.D., which requires proof that defendant took, held, or detained K.D. either by force or "by

18

instilling *reasonable* fear." (*Burney*, *supra*, 47 Cal.4th at p. 232, italics added.) As K.D. testified that she was not forced into defendant's car but went in due to the threats against her younger sister, in finding defendant guilty of kidnapping, the jury necessarily must have determined that defendant's threat to rape K.D.'s younger sister instilled reasonable fear. And if the fear that defendant would rape K.D.'s younger sister was reasonable, a reasonable person of ordinary susceptibilities would have been coerced into actions that he or she otherwise would not have performed, thereby satisfying section 261's definition of duress.

In supplemental briefing, defendant observed that it may take more fear to coerce non-consensual intercourse, which is required for rape, than to coerce movement of a substantial distance, the corresponding requirement for kidnapping. (See *Burney*, *supra*, 47 Cal.4th at p. 232.) That may be correct as a purely hypothetical matter. Here, however, defendant's threats coerced K.D. into accompanying a man who had previously raped her and who evidently intended to do so again, particularly in the third and fourth incidents. Consequently, in this case, defendant's threats had to instill sufficient fear to coerce K.D. not only into accompanying him, but also into subjecting herself to non-consensual intercourse.

Defendant's remaining arguments are unpersuasive as well. For example, Defendant notes that, in urging the jury to find that K.D. was kidnapped, the prosecutor stressed that she was only 17 years old at the time and new to this country. It is appropriate, however, to consider such factors in assessing rape charges: indeed, section 261 expressly states that "in appraising the existence of duress" for purposes of rape, "[t]he total circumstances, *including the age of the victim*," should be considered. (§ 261, subd. (b)(1), italics added.) Defendant also asserts that he is not substantially older than K.D. In fact, he is 7 years older than K.D. and thus was 24 years old when she was 17. At that stage in K.D.'s life, this age gap was enormous. Defendant also notes the absence of other factors such as financial dependence but fails to establish their relevance here.

19

Consequently, if the jury relied on the threats against K.D.'s sister in convicting defendant of rape, it necessarily found a threat that created duress, which is a proper means under section 261, subdivision (a)(2). Therefore, once again, we conclude that the erroneous instruction on future injury was harmless beyond a reasonable doubt.

### III.  DISPOSITION

The judgment is affirmed.

_____

Bromberg, J.


WE CONCUR:




_____

Greenwood, P.J.




_____

Lie, J.




*People v. Ramirez Sierra*
H047833


21